COURT OF APPEALS OF VIRGINIA

Present:    Judges Bumgardner, Clements and McClanahan
Argued at Salem, Virginia


BRANDY NICHOLE WIMMER

                                        MEMORANDUM OPINION[*] BY
v.        Record No. 0977-04-3          JUDGE JEAN HARRISON CLEMENTS
                                        AUGUST 2, 2005
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF ROANOKE COUNTY
                         Robert P. Doherty, Jr., Judge

        John Weber, III (Weber Pearson PC, on brief), for appellant.

        Virginia B. Theisen, Assistant Attorney General (Judith Williams
        Jagdmann, Attorney General; Alice T. Armstrong, Assistant
        Attorney General, on brief), for appellee.


        Brandy Nichole Wimmer (appellant) was convicted in a jury trial of felony child abuse or

neglect, in violation of Code § 18.2-371.1(B).  On appeal, appellant contends the trial court erred in

(1) refusing to grant her motion to strike on the ground that the evidence was insufficient, as a

matter of law, to sustain her conviction and (2) admitting prejudicial testimony regarding the

relationship between appellant and her mother.  For the reasons that follow, we affirm appellant's

conviction.

        As the parties are fully conversant with the record in this case, and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this

appeal.

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

I.  BACKGROUND

Under familiar principles of appellate review, we view the evidence and the inferences that may be reasonably drawn from the evidence in a light most favorable to the Commonwealth, the party prevailing below.  See Garcia v. Commonwealth, 40 Va. App. 184, 189, 578 S.E.2d 97, 99 (2003).  So viewed, the facts show that appellant's daughter, M.W., was born prematurely on July 1, 2002.  She remained in the neonatal intensive care unit for the first two months of her life, after which she went home in the care of her mother.  Appellant lived at the time in the home of her mother.

As is common with premature babies, M.W. had difficulty regulating her breathing and heart rates.  Thus, M.W.'s breathing and heart rates had to be carefully monitored.  In the event that M.W. suffered either apnea (the failure of breath) or bradycardia (slowed heartbeat), medical treatment had to be immediately rendered.  M.W. was therefore placed on an apnea monitor, a device that alerts the caregiver of abnormalities in the child's respiratory or heart rate, and appellant was trained by medical staff in the use of the monitor.  The apnea monitor provided for M.W. emitted an audible alarm when the child suffered either apnea or bradycardia, and the alarm continued to sound until the triggering condition abated or the machine was turned off by pushing a specific series of buttons.  The monitor was also equipped with a memory chip that recorded the date and time of any episode of lapsed respiration or low heart rate that triggered the monitor's alarm.

According to Dr. Joseph Tamez, M.W.'s doctor and a specialist in pediatric pulmonology, there are three possible outcomes when an apnea event triggers the monitor alarm, depending in large part on how quickly the child's condition is resolved:  (1) the child may recover with no difficulty; (2) if the event is prolonged, the child's oxygen level may drop, leading to circulatory and heart-rate problems; or (3) in the most severe situations, the child may

suffer life-threatening cardiac or respiratory arrest.  Appellant was instructed that, in order to prevent the most severe consequences M.W. might suffer from such an event, she was to respond to the monitor alarm within ten seconds.  Upon hearing the alarm, she was to immediately look for "any outward signs of distress" in M.W.[1]  If she noticed any signs of distress, she was to take immediate steps to restore M.W.'s breathing and heart rates, starting with simple touching and progressing to CPR.  If the child did not immediately recover, appellant was to seek medical care for the child.  If, on the other hand, the child had no outward signs of distress and the monitor was still sounding, appellant was instructed to check the monitor and make sure the leads from the machine were still properly connected to the child.  If the leads were connected and the monitor appeared to be functioning properly, appellant was instructed "to call the pediatrician and the home care company" that provided the monitor and the training for it.  Despite the lack of outward signs of distress, the child needed to be evaluated because low heart rates were not always accompanied by outward symptoms.

Appellant was well versed in the proper use of M.W.'s apnea monitor.  A friend of appellant testified that she had heard M.W.'s monitor alarm sound more than once, and appellant responded appropriately each time.  Dr. Andrea Muelenaer, a medical expert in the field of pediatric pulmonology who reviewed the record of the home monitor that registered M.W.'s heart and respiratory rates, testified that appellant's compliance with the prescribed use of the monitor from October 23, 2002, through November 3, 2002, was "excellent," meaning that appellant used the monitor "most of the time."[2]

---

[1] Signs of distress include lips and gums that are not "nice and pink," whitened palms, raised eyebrows, flared nostrils, grunting, or concavities beneath the child's ribcage during inhalation.

[2] Dr. Muelenaer noted that there were some gaps in the monitor's usage record, but explained that such gaps were normal and typically represented times that the child was "being

On the morning of Friday, November 1, 2002, M.W. received her four-month immunizations. Appellant was told that M.W. would probably be "fussy" for the rest of the day and might develop a fever. That afternoon and evening, appellant packed her belongings for an impending move from her mother's home, while her friend Malinda Beckner cared for M.W. at Beckner's apartment. Before leaving M.W. with Beckner, appellant showed Beckner how to use the monitor and told her to check the baby if the monitor alarm sounded and call for help if necessary. At approximately 11:00 p.m., appellant arrived at Beckner's apartment. M.W. had sustained no injuries while in Beckner's care and appeared healthy.

Appellant and M.W. then spent the night at Beckner's apartment. Beckner stayed up talking and watching television with appellant until about 2:30 a.m., when Beckner went to her bedroom at the far end of the apartment to go to bed. While getting ready for bed, Beckner heard the monitor alarm go off "for a couple of seconds." Figuring appellant would let her know if something was wrong, Beckner did not check to see what was going on. Appellant went to sleep between 3:00 and 4:00 a.m. She slept on a couch in the living room with M.W. beside her, within "arm's reach" of M.W.'s apnea monitor.

M.W. and appellant spent Saturday night at the home of appellant's mother. On Sunday morning, appellant took M.W. to the doctor because M.W. was "jerky" and could not be comforted. The doctor opined that M.W. was likely having a reaction to the recent immunizations and instructed appellant to take M.W. to the emergency room if her condition worsened. Later that evening, M.W.'s condition worsened and appellant took her to the emergency room. M.W., who was "critically ill" and suffering from generalized motor seizures, was admitted to the pediatric intensive care unit.

---

held," "getting a bath," or involved in some other activity during which the baby was disconnected from the monitor.

During the resultant investigation into the possible causes of M.W.'s condition, it was discovered, upon electronically retrieving the information on the memory chip of M.W.'s apnea monitor, that the monitor's alarm was triggered at 5:08 a.m. on November 2, 2002, and sounded continuously for over twenty-seven minutes, with no action taken to abate the child's triggering condition or to turn off the monitor. The monitor, which was later checked and found to be in proper working order, detected two distinct episodes of apnea during that time period and an episode of bradycardia that lasted twenty-seven minutes and twenty-four seconds. Conceding she took no action during the twenty-seven-minute period the alarm was sounding, appellant testified she did not hear the alarm sound. The monitor alarm, which was fully demonstrated for the jury, became progressively louder the longer it sounded.

Appellant was charged with violating Code § 18.2-371.1(B) and was subsequently tried before a jury. During the trial, the Commonwealth attempted to present evidence that appellant had been told to leave her mother's house and was in the process of moving out on the weekend of November 1–3, 2002, to show that she was preoccupied in her care of M.W. Appellant objected to the admission of that evidence on grounds of relevance. The trial court ruled that the testimony was admissible. Appellant made no further objection to the court's ruling.

Appellant also raised a motion to strike at the close of the Commonwealth's evidence and renewed the motion at the close of all the evidence, contending the evidence presented was insufficient to support a conviction. The trial court denied the motion in both instances.

The jury found appellant guilty of child abuse or neglect and recommended a sentence of twelve months in jail. By order entered March 30, 2004, the trial court imposed sentence in accordance with the jury's verdict.

This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Appellant contends the evidence presented at trial was insufficient, as a matter of law, to sustain her conviction of child abuse or neglect. Thus, she concludes, the trial court erred in denying her motion to strike. We disagree.

Appellant was charged with violating Code § 18.2-371.1(B). That statute provides, in pertinent part, as follows:

> Any parent, guardian, or other person responsible for the care of a child under the age of 18 whose willful act or omission in the care of such child was so gross, wanton and culpable as to show a reckless disregard for human life shall be guilty of a Class 6 felony.

Code § 18.2-371.1(B).

Appellant does not dispute that she was responsible for the care of M.W. when the apnea monitor alarm sounded continuously for over twenty-seven minutes at 5:08 a.m. on November 2, 2002, or that she did not check on M.W.'s condition at the time or take any other steps in response to the monitor's alarm to determine why the alarm was sounding. Likewise, appellant does not dispute that she was aware at the time that her failure to respond to the monitor's alarm had potentially grave consequences to the health and life of her child or that M.W. was under eighteen years of age at the time. Rather, appellant argues solely that there was no evidence contradicting her testimony that she did not hear the alarm when it reportedly sounded at 5:08 a.m. on November 2, 2002, and there was no evidence that she "had done or failed to do anything that caused or contributed to" M.W.'s subsequently diagnosed condition. Thus, she argues, the Commonwealth's failure to present any evidence that she "heard and ignored the monitor alarm" or that she "acted or failed to act in a manner which caused serious injury to her daughter . . . supports [her] contention that there was insufficient evidence to convict [her] of child abuse and neglect."

- 6 -

In arguing that the evidence was insufficient because the Commonwealth failed to show that her failure to respond to the alarm caused M.W.'s subsequent medical condition, appellant misconstrues the offense for which she was charged and convicted.

> Unlike Code § 18.2-371.1(A), the plain language of Code § 18.2-371.1(B)(1) does not require that a child actually suffer serious injury as a result of a defendant's acts or omissions. The absence of an injury requirement in subsection (B)(1) reflects the lesser nature of the offense, a Class 6 felony, and demonstrates a legislative intent to prohibit conduct that also has the potential of endangering a child's life.

Commonwealth v. Duncan, 267 Va. 377, 385, 593 S.E.2d 210, 215 (2004). Thus, the Commonwealth was not required to prove that M.W. actually suffered a serious injury as a result of appellant's failure to respond to the monitor alarm, but merely that appellant's failure to respond to the alarm "subject[ed the] child to a substantial risk of serious injury, as well as to a risk of death, because exposure to either type of risk can endanger the child's life." Id. Consequently, because actual injury is not an element of the crime for which appellant was charged and convicted, we will not reverse appellant's conviction based on her claim that the Commonwealth failed to causally connect appellant's conduct with the injuries M.W. actually suffered.

In arguing that the evidence was insufficient because the Commonwealth failed to produce evidence contradicting her testimony that she did not hear the monitor alarm when it sounded continuously for over twenty-seven minutes at 5:08 a.m. on November 2, 2002, appellant disregards the full content of the record and this Court's established standard of review.

When the sufficiency of the evidence is challenged on appeal, we review the evidence "in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom." Bright v. Commonwealth, 4 Va. App. 248, 250, 356 S.E.2d 443, 444 (1997). "In so doing, we must discard the evidence of the accused in conflict with that of the

Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." Cirios v. Commonwealth, 7 Va. App. 292, 295, 373 S.E.2d 164, 165 (1988). "The jury's verdict will not be set aside unless it appears to be plainly wrong or without evidence to support it." Watkins v. Commonwealth, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998). We are further mindful that the "credibility of a witness, the weight accorded the testimony, and the inferences to be drawn from proven facts are matters solely for the fact finder's determination." Crawley v. Commonwealth, 29 Va. App. 372, 375, 512 S.E.2d 169, 170 (1999). "Where the trier of fact finds a defendant's testimony to be incredible, it is entitled to infer that the defendant lied to conceal his guilt." Watkins, 26 Va. App. at 349, 494 S.E.2d at 866.

Here, the evidence established that appellant went to bed on November 2, 2002, between 3:00 and 4:00 a.m. and slept on a couch within "arm's reach" of M.W.'s apnea monitor, which was determined to be in proper working order. At 5:08 a.m., the monitor alarm sounded for over twenty-seven minutes. The jury heard a demonstration of the monitor's alarm during trial. Appellant testified that she did not hear the alarm when it sounded on the morning of November 2, 2002. However, the jury was not required to believe the defendant's testimony and could infer that she was lying to conceal her guilt. Having heard the alarm at trial, the jury was in the best position to assay the alarm's efficacy in alerting a sleeping caregiver and to evaluate the credibility of appellant's claim that she did not hear the alarm during the more than twenty-seven minutes it sounded. Upon an assessment that appellant could not have slept through the alarm, the jury could have reasonably inferred that she heard the alarm and willfully failed to respond to it, with a reckless disregard to the potentially life-threatening consequences her failure to act posed to her daughter.

Moreover, the mere failure to hear the warning signs of possible danger does not necessarily absolve a caregiver of liability. See Barrett v. Commonwealth, 268 Va. 170, 184,

597 S.E.2d 104, 111 (2004) (holding that the "act of falling asleep" must be viewed in light of all the surrounding circumstances). Even if the jury believed that appellant slept through the alarm without hearing it, having heard the alarm at trial and aware of appellant's proximity to the monitor when the alarm sounded, the jury could have reasonably concluded that appellant had willfully put herself in the position, either by needlessly staying up until 4:00 a.m. or by some other undisclosed means, of falling into such a deep and inert sleep as to be unable to respond to the alarm for over twenty-seven minutes. Clearly, appellant was aware of such a danger. She testified at trial that, at the time of the incident in question, she was not taking medication prescribed by her doctor because it made her drowsy. She explained: "I am not afraid to go to sleep, but I didn't want to be in a deep sleep in case my child needed attention. Her alarm might sound and I might not hear it."

We cannot say, under the circumstances of this case, that the jury's verdict was plainly wrong or without evidence to support. Indeed, the evidence supports the fair inference that appellant was or should have been alerted to the sounding of the apnea monitor alarm in full awareness of its significance and yet took no action for over twenty-seven minutes to check on the condition of her child. We hold, therefore, that the evidence is sufficient to sustain appellant's conviction for child abuse or neglect under Code § 18.2-371.1(B). Hence, the trial court did not err in denying appellant's motion to strike.

### III.  ADMISSIBILITY OF EVIDENCE

Appellant contends the trial court improperly permitted the Commonwealth to present evidence that she had been told to leave her mother's house and was in the process of moving out on the weekend in question. She argues that this testimony was unduly prejudicial in that it encouraged the jury to convict for an improper reason. The Commonwealth argues that

consideration of appellant's claim is barred on appeal because she never raised this particular objection in the trial court. We agree with the Commonwealth.

"No ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling . . . ." Rule 5A:18. Absent extraordinary circumstances not present here, Rule 5A:18 requires a contemporaneous and specific objection and will not permit appellate review unless the trial court had the opportunity to address the same argument raised on appeal. Thomas v. Commonwealth, 44 Va. App. 741, 750, 607 S.E.2d 738, 742, aff'd en banc, 45 Va. App. 811, 613 S.E.2d 870 (2005); see also Correll v. Commonwealth, 42 Va. App. 311, 324, 591 S.E.2d 712, 719 (2004) (holding that the "same argument must have been raised, with specificity, at trial before it can be considered on appeal"); West Alexandria Props., Inc. v. First Va. Mortgage, 221 Va. 134, 138, 267 S.E.2d 149, 151 (1980) (holding that, even where taking the same general position as it did in the trial court, an appellant "may not rely on reasons [that] could have been but were not raised for the benefit of the lower court").

On appeal, appellant argues solely that the challenged testimony was unduly prejudicial. At no time did appellant make the same argument to the trial court, arguing instead that the testimony was inadmissible on relevance grounds. Appellant having failed at trial to make the same argument she raises on appeal, Rule 5A:18 bars our consideration thereof.

## IV. CONCLUSION

For these reasons, we affirm appellant's conviction.

<u>Affirmed.</u>